IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JERRY BAPTISTE,

      Defendant.

CRIMINAL ACTION NO.

1:20-cr-296-JPB-CMS

## <u>REPORT & RECOMMENDATION</u>

This case is before the Court on Defendant Jerry Baptiste's motion to suppress evidence seized pursuant to an email search warrant. [Doc. 439]. For the reasons discussed below, I will recommend that this motion be denied.

## I.      Background

On August 4, 2020, a grand jury sitting in the Northern District of Georgia returned a thirty-count indictment against five defendants, charging crimes stemming from a scheme to fraudulently obtain loans from the U.S. Small Business Administration under the Paycheck Protection Program ("PPP") established as part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. [Doc. 1, Indictment]. Among other things, the Indictment alleged that Defendant Bern Benoit submitted a fraudulent PPP loan application on behalf of his company, Transportation Management Services, Inc. ("Transportation Management"). [*Id.*

¶¶ 4, 23].   His co-defendant, Jerry Baptiste (the subject of this Report and Recommendation), was not initially named as a defendant in the case.

After the Indictment was returned, the investigation continued into other suspected criminal activity and into other potential defendants.  On August 18, 2020, as part of the ongoing investigation, federal agents obtained a search warrant for several email accounts, including one used by Jerry Baptiste, netbasedstudios@gmail.com ("NBS Account").   The warrant to search the NBS Account is the subject of the instant motion to suppress.  [Doc. 439-1].

Over the course of the next year, the Indictment was superseded two times, each time adding more charges and more defendants.  Baptiste was charged in a sixty-two count First Superseding Indictment on July 13, 2021, along with fourteen others.  [Doc. 135].  And on August 10, 2021, a grand jury returned a sixty-three count Second Superseding Indictment naming Baptiste and fifteen others as defendants.  [Doc. 290].

In the Second Superseding Indictment, Baptiste is charged with conspiracy to commit bank and wire fraud (Count 9);  substantive counts of bank fraud, wire fraud, and making false statements (Counts 10, 11, and 38); and money laundering (Counts 48–50).  [S.S. Indictment ¶¶ 88–97, 180–83].

2

With respect to the conspiracy charge alleged in Count 9 and the substantive counts of bank fraud, wire fraud, and false statements alleged in Counts 10, 11, and 38, the Second Superseding Indictment alleges that Baptiste, along with others, conspired to submit (and actually submitted) false materials to a financial institution for the purpose of obtaining a PPP loan.  [S.S. Indictment ¶¶ 90, 95, 97, 181]. According to the Second Superseding Indictment, Baptiste was involved with Bern Benoit's fraudulent Transportation Management PPP loan application, falsely certifying in the application, among other things: that the company was in operation on February 15, 2020; that the company had employees for whom it paid salaries and payroll taxes or paid independent contractors; and that the loan proceeds would be used to retain workers, maintain payroll, and/or make certain payments on behalf of the company such as mortgage interest payments, lease payments, and utility payments.  [*Id.* ¶ 181].  In connection with the loan application process, Baptiste allegedly utilized (1) a fabricated bank statement listing inflated account balances and non-existent transactions, (2) fabricated IRS Form 941s listing falsified payroll information, and (3) false loan application documentation that listed false employment/payroll information for the loan funding.  [*Id.* ¶¶ 91, 95, 97, 181]. According to the Second Superseding Indictment, as a result of this fraudulent conduct, a federally-insured lender issued Transportation Management a PPP loan

in the amount of $830,417.  [*Id.* ¶ 92].  With respect to the money laundering charges, the Second Superseding Indictment identifies three transactions in May and June 2020 in the following amounts: $185,000, $100,000, $169,998.72.  [*Id.* ¶ 183].

## II.    Facts Relevant to the Motion to Suppress

As noted above, in August 2020—after the original indictment had been returned but before it had been superseded to include Baptiste as a defendant—FBI Special Agent Joseph D. Stites submitted an application and affidavit for a search warrant for seven Gmail accounts, including Jerry Baptiste's NBS Account.  [Doc. 439-1 ("Stites Aff.")].

In his 34-page affidavit, Special Agent Stites provided facts to show that the Transportation Management PPP loan had been fraudulently obtained.  For example, he averred the following:

- To obtain a PPP loan, a business was required to submit information regarding its average monthly payroll expenses and its number of employees; the information was used to calculate the amount of the loan the business was eligible to receive.  [Stites Aff. ¶ 15].

- A PPP loan could be used to pay only approved expenses, including payroll costs, interest on mortgages, rent, and utilities.  [*Id.* ¶ 17].

- Bern Benoit (who had already been indicted at the time this affidavit was submitted) claimed sole ownership of Transportation Management.  [*Id.* ¶¶ 12, 32].

- On or about May 20, 2020, Transportation Management submitted a PPP loan application to BlueVine Capital Inc., a PPP loan

4

processor, seeking a PPP loan in the amount of $830,417. [*Id.* ¶¶ 21, 33].

- On its loan application, Transportation Management listed an email address that was created on May 19, 2020, the day before Transportation Management submitted its loan application. [*Id.* ¶¶ 33, 42]. That email account was linked by recovery phone number and by cookies to Meghan Thomas, the wife of Darrell Thomas, one of the five people charged in the original Indictment.[1] [*Id.* ¶¶ 43–44]. Darrell Thomas is the purported owner of a business that submitted a PPP loan application using documentation substantively identical to the document used by Transportation Management and which received some of the proceeds of Transportation Management's PPP loan. [*Id.* ¶¶ 22–23, 27, 30–31, 52].

- In support of its application, Transportation Management submitted purported Form 941s (Employer's Quarterly Federal Tax Returns) for January through December 2019 that reflected that during each quarter of 2019, Transportation Management had between 57 and 63 employees and had between $815,954 and $905,132 in average monthly payroll costs. [*Id.* ¶ 23]. The Form 941s that Transportation Management submitted reported identical employee and average monthly payroll figures as Form 941s submitted by four

---

[1] Darrell Thomas was charged along with Bern Benoit in August 2020 in the original Indictment. [Doc. 1]. Meghan Thomas was also charged in this case, having been added as a defendant in the First Superseding Indictment. [Doc. 133]. Bern Benoit and Darrell Thomas have both pled guilty and been sentenced. [Docs. 380, 473]. Bern Benoit pled guilty to conspiracy to commit bank fraud and wire fraud and was sentenced to 27 months imprisonment, with restitution of $1,105,217, which includes the amount of the Transportation Management PPP loan proceeds. [Doc. 380]. Darrell Thomas pled guilty to two counts—conspiracy to commit fraud and money laundering—and was sentenced to 180 months imprisonment, with restitution of more than $13 million. [Doc. 473]. Meghan Thomas has pled guilty and is scheduled to be sentenced on November 30, 2022. [Doc. 516, Dkt. Entry dated July 27, 2022].

other businesses. [*Id.*]. In reality, however, IRS records showed that Transportation Management had not filed any Form 941s in 2019. [*Id.* ¶ 24].

- In support of its application, Transportation Management also submitted what appears to be a fabricated bank statement for February 2020. [*Id.* ¶ 25]. The bank statement was identical to bank statements submitted by two other businesses. [*Id.*]. However, bank records confirmed that Transportation Management did not open its bank account until April 21, 2020, meaning that there were no legitimate bank statements for February 2020. [*Id.*].

- Based on the fabricated information and documentation that Transportation Management submitted, Transportation Management received a PPP loan of approximately $830,417. [*Id.* ¶ 35].

- On August 4, 2020, a grand jury in the Northern District of Georgia returned an indictment charging Bern Benoit, Darrell Thomas, and others with various fraud and money laundering-related charges. [*Id.* ¶ 12].

Special Agent Stites also included facts to show why the agents suspected that money laundering activities were occurring in connection with the Transportation Management PPP loan, including:

- After receiving $830,417 in fraudulent PPP loan proceeds, Transportation Management made large payments to two of Darrell Thomas's companies—Bellator Phront Group Inc. ("Bellator") and Elite Executive Services Inc. ("Elite"). [Stites Aff. ¶¶ 35, 48, 52].

- Bellator and Elite are both controlled by Darrell Thomas and/or his wife, Meghan Thomas. [*Id.* ¶¶ 27, 31].

- Between May 22, 2020 and June 15, 2020, Bellator received approximately $542,200 of fraudulently obtained PPP loan proceeds. [*Id.* ¶ 30].

- Between May 21, 2020 and June 16, 2020, Elite received approximately $1,525,850.15 of fraudulently obtained PPP loan proceeds from Transportation Management and from other businesses. [*Id.* ¶¶ 23–25, 31].

- On June 15, 2020, Transportation Management wired $169,998.72 to Elite and purchased a $100,000 cashier's check made out to Bellator. [*Id.* ¶ 52]. These payments were made on the same day as, and pursuant to, instructions that Bern Benoit (Transportation Management's owner) received regarding disbursement of Transportation Management's PPP loan proceeds (discussed further below). [*Id.* ¶¶ 51–52].

- Using the email <u>Jerry@netbasedstudios.com</u>, Jerry Baptiste instructed Bern Benoit to identify the $100,000 payment to Bellator as being for "warehouse rent" and the $169,998.72 payment to Elite as being for "payroll business management services." [*Id.* ¶ 51]. Baptiste also told Benoit that he would get some of these amounts back. [*Id.*].

- Darrell Thomas used some of the fraudulent PPP loan proceeds to purchase luxury vehicles. [*Id.* ¶¶ 55–56].

Finally, Special Agent Stites included facts in his affidavit showing why the agents believed that evidence related to the Transportation Management PPP loan and money laundering activities would be found in Baptiste's NBS Account:

- Based on text messages and other information provided by Benoit, Baptiste (using the NBS Account) and Charles Knight (using the email address <u>charleswilliamknight7@gmail.com</u>) were involved in the preparation and submission of Transportation Management's fraudulent PPP loan application. [Stites Aff. ¶ 34]. Also, Google

records show that the charleswilliamknight7@gmail.com account was deleted hours after Special Agent Stites called Bern Benoit to discuss Transportation Management's fraudulent PPP loan. [*Id.*].

- On May 29, 2020, an email was exchanged between the charleswilliamknight7@gmail.com account and the NBS Account. [*Id.* ¶ 34]. The subject line of the email was "Expenses for Transportation Management Services," and it included an itemized list of purported expenses for Transportation Management. [*Id.*].[2]

- On June 15, 2020, Baptiste sent Benoit an email with the subject line "disbursement time." [*Id.* ¶ 51]. He did so from the email address jerry@netbasedstudios.com (i.e., not his NBS Account that is the subject of the warrant). The email said:

    Ok it's disbursement time. Important . . . remember and remind Bern that he will be getting about 322k out of this deal for free. And everything is done for the purpose of keeping him legal and safe. So…no angst, questioning, 3 way calls or other drama allowed. This is the way it goes, no objection. Let's make this easy and just do what's necessary. The split is 40% Bern and 60% processor/doc people/cpa/taxes etc

    1) We need him to do another cashier check for 100k make it out to warehouse rent same company name (he will get 50k of this back)

    2) Payroll wire to Elite Executive Services Inc.

    7200 Grandview Overlook
    Duluth, Ga 30097

---

[2] This May 29, 2020 email is the main focus of the motion to suppress. In the affidavit, Special Agent Stites erroneously states that Charles Knight sent the email to Jerry Baptiste. Apparently, it was Baptiste who sent the email to Knight. [Doc. 439-2 at 4]. The significance (or lack of significance) of this error is discussed later in this Report and Recommendation.

Account: xxxxxxx44823
Routing: xxxxx9593

Total wire amount: $169,998.72

In memo line for wire put payroll business management services

Bern will get a big chunk of this back via wire/payroll cards

There will be a second payroll run in about a week and a 1/2 for 169,998.72

And then a final payroll run two weeks after that for whatever the balance is.

Need this done today. No conference call needed its easy. Thanks.

[*Id.*].

- Header information provided by Google shows that on June 15, 2020, the same date as the "disbursement time" email, the NBS Account and the charleswilliamknight7@gmail.com account exchanged approximately nineteen emails. [*Id.* ¶ 54]. They also exchanged many emails in May and June 2020. [*Id.*].

- On June 15, 2020, the same day as the "disbursement time" email, Transportation Management wired $169,998.72 to Elite and purchased a $100,000 cashier's check made out to Bellator. [*Id.* ¶ 52].

- Bank records show that Transportation Management transferred at least $51,000 of the fraudulent PPP loan proceeds to Baptiste or his company, J Anthony Properties, in May and June 2020. [*Id.* ¶ 53]. As noted earlier, the only approved expenses under the PPP are payroll costs, interest on mortgages, rent, and utilities. [*Id.* ¶ 17].

9

- Header information shows that Benoit and the NBS Account exchanged several emails in May and June 2020. [*Id.* ¶ 53]. For example, the May 29, 2020 "expenses" email was forwarded to Benoit from the NBS Account. Additionally, Benoit received an email from the NBS Account on June 2, 2020, the same day that Transportation Management made a $12,000 payment to Jerry Baptiste's company. [*Id.*].

On August 18, 2022, United States Magistrate Judge Justin S. Anand signed the warrant that Special Agent Stites had presented, authorizing the agents to search the NBS Account (as well as the other accounts listed in the application) "for the time period March 31, 2020 through the present." [Doc. 439-1 at 44–52]. The warrant authorized agents to seize "[a]ll information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of 18 U.S.C. §§ 1343, 1344, 1349, 1014, 1956, and/or 1957 involving the target and/or any associates or accomplices." [Doc. 439-1 at 49]. The warrant expressly authorized agents to seize information related to the following matters, to the extent they fell into the broader category of "contraband, fruits, evidence and/or instrumentalities of violations" of those statutes:

- identities of persons who created or used the email accounts;

- the PPP, including any PPP loan submitted by any business and any communications related to PPP loan applications;

- any fraudulent loan application;

10

- the incorporation, ownership, or control of Bellator, Elite, Transportation Management, and several other businesses identified as part of the investigation;

- the use or expenditure of proceeds from any PPP loan;

- user agent strings used to access the services;

- how and when the account was accessed or used;

- means and source of payment for services;

- the subscriber's state of mind as it relates to the crimes under investigation; and

- the identity of co-conspirators or aiders and abettors.

[*Id.* at 49–51].

After he was indicted, Baptiste filed a motion to suppress all evidence obtained from the search of the NBS Account, arguing that the warrant "falsely described and made material omissions" concerning one of the emails quoted in the affidavit. [Doc. 429 at 2]. Baptiste argues that this material omission/false description was done either intentionally or with reckless disregard for the truth, and he demands a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). He also argues that the warrant amounts to an impermissible general warrant because (1) there was no probable cause for a "sweeping, general production" and (2) the affidavit does not set forth a legally sufficient nexus between the alleged criminal

11

activity and specific articulable facts sufficient to guide the agents' discretion in selecting items to be seized. [Doc. 439 at 2–3]. I will take these arguments in reverse order.

## III.   Discussion

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Here Baptiste challenges both probable cause and particularity.

### A. *The warrant was supported by probable cause.*

I will begin by reviewing the probable cause basis for the warrant. With respect to probable cause, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a

conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).  "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  *Id.* (citation omitted).  Issuing judges are to employ a practical, commonsense approach to the probable cause analysis and should avoid hyper-technical review of the legitimacy of search warrants:

> In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal citations and quote marks omitted).  Reviewing courts accord "great deference" to judicial

determinations of probable cause to issue a search warrant.  *United States v. Leon*, 468 U.S. 897, 914 (1984); *Martin*, 297 F.3d at 1317.

Here, Baptiste appears to concede that the affidavit contained at least *some* probable cause, i.e., probable cause sufficient to support a search for information related to the Transportation Management PPP loan.  But he asks the Court to take a narrow view of that probable cause, arguing that there was insufficient probable cause to support a search for anything else.  [Doc. 439 at 18–20].  I find this cramped view of the probable cause to be hyper-technical and not supported by the case law.

The evidence recounted above that was described in the Stites Affidavit established probable cause to believe that the Transportation Management PPP loan was fraudulently obtained; that Jerry Baptiste was involved in submitting the loan application; and that the NBS Account had been used in connection with laundering the proceeds of fraudulently obtained loan proceeds.  Moreover, there was probable cause to believe that the Transportation Management PPP loan was part of a pattern of fraudulent conduct, given that there were five nearly identical fraudulent PPP applications submitted.  [Stites Aff. ¶¶ 22–25].

While it was not a certainty that evidence of the enumerated crimes would be discovered in the NBS Account, the "totality of the circumstances" makes it probable that such evidence would be found, and that is all that the law requires.

*Brundidge*, 170 F.3d at 1352.  It is evident that Judge Anand followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

### B. The warrant is sufficiently particular and is not an impermissible general warrant.

The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the persons or things to be seized.  U.S. CONST. amend. IV; *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).  The particularity requirement protects against "the use of general warrants as instruments of oppression."  *Stanford v. Texas*, 379 U.S. 476, 482 (1965).  "The requirement that warrants particularly describe the place to be searched and the things to be seized makes general searches under them impossible."  *Travers*, 233 F.3d at 1329.  A search based on a warrant that fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutional.  To deter such warrants and searches, any evidence so seized must be excluded from the trial of the defendant. *See Stone v. Powell*, 428 U.S. 465, 492 (1976) ("Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease.").  The Eleventh Circuit instructs that the particularity requirement "be applied with a practical margin of flexibility,

15

depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982) (citations omitted).

Baptiste contends that the warrant was not particular enough, i.e., that there were insufficient facts in the Stites Affidavit to guide the agents' discretion in selecting items to be seized beyond those relating to the Transportation Management PPP loan. [Doc. 439 at 18; Doc. 485 at 1]. Baptiste argues that agents were left without guardrails to search for items related to "multiple, unidentified and unalleged transactions," because they had facts about only one transaction to guide them. [Doc. 485 at 3].

The Eleventh Circuit has held that warrants are sufficiently particular where they include limitations on what may be seized based on the crimes under investigation, holding that such limitations enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. For example, in *United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985), the Eleventh Circuit upheld a warrant that authorized the seizure of "all property" constituting evidence of loansharking crimes. *Id.* at 613–14. The defendant later moved to suppress certain items seized in the search, including desktop calendars, index cards,

and slips of paper, all bearing notations relating to interest payments. *Id.* at 614.

The district court denied the motion to suppress, and the Eleventh Circuit affirmed,

noting that although these documents were not specifically described in the search

warrant, they were properly seized because they fell within the portion of the warrant

authorizing the seizure of "all property" constituting evidence of loansharking. *Id.*

The Eleventh Circuit stated:

> because there is no evidence that the FBI had additional information
> that would have allowed the warrant applicant to give a more
> particularized description of the loansharking evidence located in
> Santarelli's residence, we . . . conclude that the warrant satisfied the
> particularity requirement of the fourth amendment.

*Id.* at 615.

Similarly, in *Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741 (11th Cir.

2011), the Eleventh Circuit found a warrant to be sufficiently particular that

authorized seizure of a number of items, such as documents, records, and computer

equipment that contained evidence of a criminal violation of laws prohibiting bad

faith manufacture, purchase, sale, or delivery of anabolic steroids by prescription,

and laws prohibiting the distribution of controlled substances. *Id.* at 745–46. The

Eleventh Circuit held that "[b]ecause the descriptions in the warrants refer to items

that are evidence of a violation of certain statutes relating to the sale of controlled

substances, the items were described with sufficient particularity to allow Wright, a

17

seasoned law enforcement officer, to identify the things to be seized." *Id.* at 746

(citing *United States v. Betancourt*, 734 F.2d 750, 754–55 (11th Cir. 1984)).

Like the searches in *Santarelli* and *Signature Pharmacy*, the agents in this

case could not give an exact description of the items to be seized, but the warrant

was "as specific as the circumstances and nature of activity under investigation

permit." *Wuagneux*, 683 F.2d at 1349.  The description of the items to be seized was

sufficiently detailed and particularized because it provided for the seizure of things

that constituted "contraband, fruits, evidence and/or instrumentalities" of violations

of the enumerated statutes, i.e., wire fraud and bank fraud (18 U.S.C. §§ 1343, 1344);

conspiracy (18 U.S.C. § 1349); false statements (18 U.S.C. § 1014); and money

laundering (18 U.S.C. §§ 1956, 1957).  [Doc 439-1 at 49].  Moreover, the NBS

Account warrant identified specific categories of information including the identities

of persons who created or used the email accounts; the PPP, including any PPP loan

submitted by any business and any communications related to PPP loan applications;

any fraudulent loan application; the incorporation, ownership, or control of Bellator,

Elite, Transportation Management, and several other businesses identified as part of

the investigation; the use or expenditure of proceeds from any PPP loan; user agent

strings used to access the services;  how and when the account was accessed or used;

means and source of payment for services; the subscriber's state of mind as it relates

18

to the crime under investigation; and the identity of co-conspirators or aiders and abettors.  [*Id.* at 49–51].  These categories describe evidence that would be relevant to the FBI's investigation of fraudulent activity and money laundering with respect to PPP loans, and these categories are sufficiently particular such that the agents could ascertain and identify the things to be seized.  *See Santarelli*, 778 F.2d at 614.  In sum, the warrant "enables [a] searcher reasonably to ascertain and identify" the information within the warrant's scope.  *Id.*  Contrary to Baptiste's arguments, the agents executing the warrant were not unguided and free to rummage around his email account.  Rather, they were limited in a way that was consistent with the probable cause established in the Stites Affidavit.

Baptiste relies on *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), to support his argument that the warrant was overbroad.  He contends that after *Blake*, warrants must be "as limited as possible," and he argues that the warrant here was not sufficiently limited.[3]  [Doc. 439].  In *Blake*, the Eleventh Circuit concluded that

---

[3] In his brief, Baptiste complains multiple times about "the two-step seizure process employed here."  [Doc. 439 at 15, 16, 17].  As Judge May recently noted, "[f]ederal courts in this circuit and others, both before and after *Blake*, 'routinely uphold warrants requiring production of all information associated with a computer hard drive or email account in the face of challenges based on the particularity requirement, so long as the warrant limits seizure to relevant evidence.'"  *United States v. Addaquay*, No. 1:20-cr-126-LMM-JSA, 2021 WL 1541051, at *4 (N.D. Ga. Apr. 19, 2021) (quoting *United States v. Roper*, No. CR 117-035, 2018 WL

warrants requiring Facebook to disclose "virtually every kind of data that could be found in a social media account" were unconstitutional because, for example, the warrants could have limited the search of private messages to only those sent or received from persons suspected of being involved with the offense. *Id.* at 974. The court also noted that the warrants should have included a time limitation. *Id.*

As explained above, the warrant in this case did not suffer from the same problems as the warrants in *Blake*. The warrant for the NBS Account included a narrowly tailored date restriction, requiring Google to disclose information for a time period of less than five months ("for the time period March 31, 2020 through the present [August 18, 2020]") and authorizing seizure of only a subset of that

---

1465765, at *3 (S.D. Ga. Mar. 1, 2018), *adopted by* 2018 WL 1463365 (S.D. Ga. Mar. 23, 2018). The two-step procedure for seizing and searching electronically stored information is rooted in Federal Rule of Criminal Procedure 41, which authorizes the "seizure of . . . electronically stored information" followed by "a later review . . . of the information consistent with the warrant." FED. R. CRIM. P. 41(e)(2)(B). An email account, like other repositories of electronically stored information covered by Rule 41(e)(2)(B), may contain an enormous volume of data. Thus, "a warrant that requires disclosure of the entire contents of an email account and then describes a subset of that information that will be subject to seizure is reasonable" as long as its descriptors are sufficiently specific. *See United States v. Soviravong*, No. 1:19-cr-146-AT-CMS, 2019 WL 7906186, at *6 (N.D. Ga. Dec. 2, 2019) ("By explicitly limiting the scope of what may be searched and seized to evidence of the crimes under investigation, the [warrant] was sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized."), *adopted by* 2020 WL 709284 (N.D. Ga. Feb. 12, 2020).

information.  [Doc. 439-1 at 47, 49].  Moreover, in *Blake*, the defendant showed examples of ways that the agents could reasonably have limited the warrant. Baptiste, in contrast, has made no such showing.

I conclude that the warrant in this case imposed reasonable time and subject-matter boundaries, unlike the problematic warrants in *Blake*.  The NBS Account warrant did not permit a "general exploratory search" of the information in the email accounts, and therefore was sufficiently particularized.  *See Addaquay*, 2021 WL 1541051, at *4–5.

### C. The Stites Affidavit connects Baptiste with Knight and Benoit.

Baptiste also argues that the Stites Affidavit is fatally flawed because it does not contain sufficient facts about him, his business, or any relationship he might have had with Charles Knight and Bern Benoit, the two people mentioned in the affidavit with whom the NBS Account communicated.  [Doc. 439 at 17].  This argument simply ignores facts articulated in the Stites Affidavit.  For example, the Stites Affidavit provided facts tying Baptiste (or his email account) to Transportation Management, to the fraudulent PPP application, and to money laundering activities. [Doc. 439-1, Stites Aff. ¶ 51 (Baptiste instructed Benoit to identify the $100,000 payment to Bellator as being for "warehouse rent" and a $169,998.72 payment to Elite as being for "payroll business management services."); ¶ 34 (based on text

messages and other information provided by Benoit, Baptiste and Knight were involved in the preparation and submission of Transportation Management's fraudulent PPP loan application); ¶ 34 (the May 29, 2020 "expenses" email); ¶ 51 (the "disbursement time" email); ¶ 54 (multiple emails on June 15, 2020 between Baptiste and Knight); ¶ 52 (on June 15, 2020, the same day as the "disbursement time" email, Transportation Management wired $169,998.72 to Elite and purchased a $100,000 cashier's check made out to Bellator); ¶ 53 (bank records show that Transportation Management transferred at least $51,000 of the fraudulent PPP loan proceeds to Baptiste or his company in May and June 2020); ¶ 53 (header information shows that Benoit and the NBS Account exchanged several emails in May and June 2020); ¶ 53 (Benoit received an email from the NBS Account on June 2, 2020, the same day that Transportation Management made a $12,000 payment to Baptiste's company)].  As such, this argument is without merit.

### D. Even if there were a problem with the warrant, the *Leon* good faith exception to the exclusionary rule would apply here.

Baptiste's motion to suppress is also due to be denied based on the good faith exception to the exclusionary rule articulated by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 922 (1984).  In *Leon*, the Supreme Court held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar admission of evidence obtained by law enforcement

officers if the officers were acting in reasonable reliance upon the search warrant. *See Martin*, 297 F.3d at 1313 (citing *Leon*, 468 U.S. at 922). The Eleventh Circuit interpreted *Leon* as follows:

> The *Leon* good faith exception applies in all but four limited sets of circumstances [citation omitted]. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Id.* (internal citations omitted). Here, Baptiste argues that "[i]t has been four years since *Blake* and *Alford*, in which the Eleventh Circuit made it clear that two-step warrants must be accompanied by limitations 'as specific as the circumstances and nature of the activity under investigation permitted.'" [Doc. 439 at 20]. Therefore, according to Baptiste, "no law enforcement officer could reasonably rely on this affidavit in obtaining the entire contents of Defendant's email account and seizing all of the items described in the warrant." [*Id.* at 3]. Based on my analysis above, I disagree with Baptiste's premise that there was anything wrong with the warrant in the first place. The warrant complied with the holding in *Blake* because it was

limited in temporal scope and nothing in *Alford* would put agents on notice that a search warrant like this one is invalid.

But even if the warrant was invalid due to some issue of probable cause, particularity, or insufficient nexus, the *Leon* good faith exception applies because the FBI agents reasonably relied on the fact that Judge Anand signed it. Baptiste has not shown that any of the "four limited sets of circumstances" exists. This Court and other courts in this circuit have approved warrants with similar two-step procedures, reasonable date ranges, and categorical subject-matter limitations. Thus, even if the warrant was invalid, the Fourth Amendment does not bar admission of any evidence obtained pursuant to it. *See Blake*, 868 F.3d at 975 (ruling that the *Leon* good faith exception to the exclusionary rule applied, despite the lack of a temporal restriction and noting: "[W]hile the warrants may have violated the particularity requirement, whether they did is not an open and shut matter; it is a close enough question that the warrants were not 'so facially deficient' that the FBI agents who executed them could not have reasonably believed them to be valid."). Here, the NBS Account warrant was not "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. For all the reasons stated, I find no basis for suppression.

### E.     *Baptiste is not entitled to a* **Franks** *hearing.*

In his motion, Baptiste claims that Special Agent Stites either intentionally or recklessly misled the Court in connection with Paragraph 34 of his affidavit, and he asks that the Court hold an evidentiary hearing into the matter.  In that paragraph, Special Agent Stites alleges, among other things, that on May 29, 2020, Charles Knight sent an email to Baptiste's NBS Account with the subject line "Expenses for Transportation Management Services."  [Stites Aff. ¶ 34].  The affidavit states that the email "included an itemized list of purported 'expenses' for Transportation Management" and that Baptiste forwarded the email to Bern Benoit, Transportation Management's owner.  [*Id.*].  In reality, Jerry Baptiste originated the email and sent it to Charles Knight on May 29, 2020.  [Doc. 439-2 at 4].  It appears that Baptiste later forwarded the email to Bern Benoit two months later.  [*Id.*].

Baptiste argues that by switching the sender and recipient of the original email, the affidavit unfairly described the expenses as "purported," making it look as if Knight had created a phony list of expenses.  [Doc. 439 at 12–13].  According to Baptiste, the agent's error improperly led to an inference of criminal activity, whereas if the correct information had been included, no such inference would have been present.  [*Id.* at 13–14].  Baptiste argues that "the government simply wrongly portrayed the information as coming from Knight to create the inference and

25

allegation that such expenses were not true." [*Id.* at 14]. In response, the Government acknowledges the error but argues that it was unintentional and harmless because switching Knight and Baptiste as sender/receiver does not affect probable cause. [Doc. 472 at 9–15].

Affidavits supporting search warrants are presumptively valid. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit." *United States v. Price*, 582 F. App'x 846, 850 (11th Cir. 2014). To be entitled to an evidentiary hearing on a motion to suppress based on the misrepresentation of a fact from a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant omitted material facts intentionally or with reckless disregard for the truth; and (2) the false statements or omissions would have negated the probable cause finding. *See Franks*, 438 U.S. at 171-72; *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). If, after setting aside the material that is the subject of the alleged falsity or reckless disregard, "there remains sufficient content in the warrant affidavit to

support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72.

Here, Baptiste has not met his burden to show that Special Agent Stites made any false statement intentionally or with reckless disregard for the truth. Rather, Special Agent Stites's switch of a sender and recipient when describing an email appears to be the type of "negligent" and "immaterial" omission that the Eleventh Circuit has held does not implicate *Franks. See, e.g., United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021); *United States v. Hyatt*, 383 F. App'x 900, 905 (11th Cir. 2010). Simply put, I can see no motive for switching the sender/receiver. Although Baptiste claims that there was nothing suspicious about the expenses because they came from Bern Benoit, the company's owner [Doc. 439 at 13], there is no evidentiary support in the record before me for this position. The face of the email plainly shows that Baptiste was the one from whom the list of expenses originated. [Doc. 439-2 at 4]. And I agree with the Government that "[w]hat mattered was that they communicated regarding Transportation Management during the time frame of Transportation Management's fraudulent loan, not who sent or received each email." [Doc. 472 at 10]. Thus, I see no motive for the agents to deliberately make such a change nor any evidence of an intentional or reckless misrepresentation.

Moreover, even if Baptiste had met his burden to provide a substantial preliminary showing of an intentional or reckless false statement and even if the sender and recipient of the email had been accurately reported, ample probable cause from the totality of the circumstances supported the search warrant. Switching the sender and recipient of the "expenses" email does not negate the fact that Jerry Baptiste and Bern Benoit communicated about the fraudulently obtained PPP loan application during the relevant time or all the other evidence set forth in detail above that demonstrates ample probable cause to believe that evidence of the specified federal crimes would likely be found in the NBS Account. The Government aptly summarizes that evidence as follows:

> In addition to the "expenses" email, the Affidavit established probable cause to believe that evidence related to Transportation Management's fraudulent loan and money laundering would be found in the NBS Account. The Affidavit describes that text messages and other information provided by Benoit on behalf of Transportation Management show [Baptiste]'s involvement in the submission of the loan, quotes the "disbursement time" email in full, explains that Transportation Management made payments of its fraudulent PPP loan proceeds precisely as instructed by [Baptiste] in that email, and states that Benoit sent at least $51,000 of the fraudulent PPP loan proceeds to [Baptiste] or his company. The Affidavit also states that charleswilliamknight7@gmail.com, which communicated frequently with the NBS Account, was deleted mere hours after Agent Stites called Benoit to ask about Transportation Management's fraudulent loan. Although [Baptiste] sent the critical "disbursement time" email from another account, the NBS Account exchanged 19 emails with charleswilliamknight7@gmail.com on the same date as the "disbursement time" email, which established probable cause to believe

that the NBS Account and charleswilliamknight7@gmail.com communicated regarding Transportation Management's loan in light of the Affidavit's allegations regarding [Baptiste]'s involvement in the fraud and money laundering scheme.

[Doc. 472 at 13–14]. Thus, even accounting for the misrepresentation in the Stites Affidavit regarding the sender and recipient of the "expenses" email, there was still ample probable cause to support the warrant. For these reasons, Baptiste has failed to show entitlement to a *Franks* hearing.

## IV. CONCLUSION

I **RECOMMEND** that Baptiste's motion to suppress [Doc. 439] be **DENIED**. Baptiste's request for a *Franks* hearing is **DENIED**.

Baptiste also filed a motion for a bill of particulars [Doc. 438], but the parties have advised that they have worked out an agreement resolving that motion. Therefore, that motion [Doc. 438] is hereby **DENIED AS MOOT**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore ORDERED that this defendant be and is hereby CERTIFIED as ready for trial.

This 29th day of August, 2022.

CATHERINE M. SALINAS
United States Magistrate Judge